**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 10-cv-24513-JLK**

JUANA CURRY and WILLIAM MOORE,
individually and on behalf of a class of
similarly situated individuals,

       Plaintiffs,

            v.

AVMED, INC., d/b/a/ AvMed, a Florida
Corporation,

       Defendant.

[Hon. James Lawrence King]

**PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT
OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**Respectfully submitted by:**

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edeslon.com
Ari J. Scharg (Admitted *Pro Hac Vice*)
ascharg@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6380
Fax: 312.589.6378

Edmund A. Normand (Florida Bar No. 865590)
ednormand@whkpa.com
EDMUND A. NORMAND PLLC
4381 New Broad Street
Orlando, Florida 32814
Tel: 407.625.9043

*Attorneys for Plaintiffs and the Classes*

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    SUMMARY OF THE LITIGATION, MEDIATION & SETTLEMENT ................... 3

    A.     Plaintiffs' Allegations and the Litigation History ................................................ 3

    B.     The Parties' Settlement Efforts and Negotiations ............................................... 5

III.   THE TERMS OF THE SETTLEMENT ................................................................ 6

    A.     Class Definitions ................................................................................................ 6

    B.     Monetary Relief ................................................................................................. 7

        1.     *Premium Overpayment Claims* ................................................................ 7

        2.     *Identity Theft Claims* ................................................................................ 8

        3.     *Payment of Notice and Administrative Fees* ............................................ 8

    C.     Prospective Relief .............................................................................................. 8

    D.     Release of Liability ............................................................................................ 9

IV.    CLASS MEMBERS HAVE BEEN PROVIDED SUFFICIENT NOTICE OF
      THE ACTION AND THE SETTLEMENT AGREEMENT ................................... 9

V.     THE PROPOSED SETTLEMENT IS FUNDAMENTALLY FAIR,
      REASONABLE, AND ADEQUATE, AND THUS WARRANTS FINAL
      APPROVAL ....................................................................................................... 12

    A.     The Settlement Was the Result of Arm's-Length Negotiation Between
        the Parties with the Assistance of an Experienced Mediator ............................ 13

    B.     The Settlement Satisfies Each of the *Bennett* Factors ....................................... 13

        1.     *Likelihood of Success at Trial* ................................................................ 14

        2.     *Range of Possible Recovery and Point at which Settlement is
            Fair, Reasonable, and Adequate* ............................................................. 15

        3.     *Complexity, Expense, and Duration of Litigation* .................................. 18

        4.     *Substance and Amount of Opposition to Settlement* .............................. 19

        **5.**    ***Stage of Proceedings at which Settlement Achieved***..............................21

**VI.**   **CONCLUSION**.............................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**<u>United States Supreme Court Cases</u>**

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ...............................................9

**<u>United States Court of Appeals Cases</u>**

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) .............................................................12

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ...................................................................12, 18

*Faught v. Am. Home Shield Corp.*, 668 F.3d 1233 (11th Cir. 2011)............................................10

*In re CP Ships Ltd. Sec. Litig.*, 578 F. 3d 1306 (11th Cir. 2009) ......................................9, 11, 12

*In re U.S. Oil & Gas Litig.*, 967 F.2d 489 (11th Cir. 1992) .........................................................12

*Jurvis v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012) .............................................................10

*Resnick v. AvMed, Inc.*, 693 F.3d 1317 (11th Cir. 2012) .........................................................4, 14

*U.S. v. Alabama*, 271 F. App'x 896, 901 (11th Cir. 2008).........................................................9, 10

**<u>United States District Court Cases</u>**

*Access Now, Inc. v. Claire's Stores, Inc.*,
   00-cv-14017, 2002 WL 1162422 (S.D. Fla. May 7, 2002) .................................................21

*Allapattah Servs., Inc. v. Exxon Corp.*,
   No. 91-cv-0986, 2006 WL 1132371 (S.D. Fla. Apr. 7, 2006) ..........................................20

*Beringer v. Certegy Check Services, Inc.*,
   No. 07-cv-01657 (M.D. Fla. Sept. 3, 2008) ......................................................................17

*Domonoske v. Bank of Am.*, N.A., 790 F. Supp. 2d 466 (W.D. Va. 2011)...................................20

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007) ...........................14, 16

*Fresco v. Auto. Directions, Inc.*,
   No. 03-cv-61063, 2009 WL 9054828 (S.D. Fla. Jan. 20, 2009) ....................13, 14, 17, 20

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001) .................................................13

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011).................12, 13

*In re Heartland Payment Sys. Inc. Customer Data Sec. Breach Litig.*,
    851 F. Supp. 2d 1040 (S.D. Tex. 2012)................................................................................17

*In re Shell Oil Refinery,* 155 F.R.D. 552, 560 (E.D.La.1993).......................................................18

*In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323 (S.D. Fla. 2001) .................................12, 15, 21

*In re Wachovia Equity Sec. Litig.*,
    No. 08-cv-6172, 2012 WL 2774969 (S.D.N.Y. June 12, 2012)......................................19

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ....................................*passim*

*Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007) .....................................14, 18, 21

**Rules and Statutes**

Federal Rule of Civil Procedure 23 ......................................................................................9, 11

**Other**

Federal Judicial Center, *Judges' Class Action Notice and Claims Process
    Checklist and Plain Language Guide* at 3 (2010), *available at*
    http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf .................10

## I.  INTRODUCTION

Plaintiffs Juana Curry and William Moore ("Plaintiffs"), individually and as representatives of the two Settlement Classes, respectfully request pursuant to Federal Rule of Civil Procedure 23 that this Court enter an order granting final approval to the class action settlement reached with Defendant AvMed, Inc. ("Defendant" or "AvMed").

The settlement of this class action lawsuit resolves claims against Defendant arising from a December 2009 data breach, wherein two laptop computers containing the unencrypted (i.e., easily accessible and readable) private information of its customers—including their names, addresses, Social Security numbers, and medical health information—were stolen from its corporate headquarters.  Plaintiffs allege that as a result of Defendant's failure to properly secure their private information, they suffered damages from having their identities stolen and by overpaying for insurance coverage (the price of which, they allege, included the costs associated with protecting their information).  After nearly three years of hard-fought litigation—which included an appeal before the Eleventh Circuit on an issue of first impression, the exchange of discovery, multiple private mediation sessions, and extensive arm's-length negotiations—the Parties were ultimately able to reach an exemplary settlement that provides monetary benefits that go well beyond the credit monitoring enrollment offer that is normally achieved through data breach class actions.  (The Parties' Settlement Agreement is attached hereto as Exhibit 1.)

Pursuant to the Court's October 25, 2013 Order granting preliminary approval of the Settlement Agreement (Dkt. 82), the Settlement Administrator has effectuated the Court-approved Notice Plan[1] and the deadline for opt outs and objections has now passed. The reaction

---

[1]      As detailed below, the Court-approved Notice Plan included the transmission of direct notice via U.S. Mail and/or email to all members of the Settlement Classes, and the creation of a

by the members of the Classes has been overwhelmingly positive: only 62 class members (out of approximately 1.2 million) have opted out and only one objection was filed.  Such a positive reaction from the Classes shouldn't be surprising given the benefits that the Settlement provides.

Under the terms of deal, AvMed has created a $3,000,000 Settlement Fund,[2] from which members of the Premium Overpayment Class (i.e., customers that have paid Defendant premiums for insurance) are entitled to claim up to $10.00 for each year that they made such payments (subject to a cap of $30.00), and members of the Identity Theft Class (i.e., those that have suffered identity theft caused by the 2009 data breach) can submit claims to recover their losses.  And, in addition to the cash payments to the two Classes, the Settlement also requires Defendant to implement a wide-range of prospective measures to ensure that its customers' private information is protected going forward.

In the end, the instant Settlement is a model for the future because the payments made available to the Premium Overpayment Class—which allows for reimbursement of a portion of the insurance premiums that Defendant should have allocated to data protection and security—is a benefit that has never before been achieved through a data breach settlement.  As such, the Settlement is fair, reasonable, and adequate, satisfying all the prerequisites for final approval required by Rule 23, the Eleventh Circuit, and Due Process.  For all these reasons, and as more fully discussed below, this Court should grant final approval.

---

settlement website (www.DataBreachSettlement.com), which provides 24/7 access to the Court-approved notice and the ability to submit claim forms online.

[2]      Unless otherwise stated, capitalized terms shall have the same meaning as set forth in the Settlement Agreement.

## II.     SUMMARY OF THE LITIGATION, MEDIATION & SETTLEMENT

### A.     Plaintiffs' Allegations and the Litigation History.

Defendant AvMed is a healthcare plan provider that offers a variety of healthcare plans to both businesses and individuals throughout the State of Florida.  (*See* Second Amended Complaint ["Compl."], Dkt. 31 at ¶ 9.)  The data breach at the center of this case occurred on December 10, 2009, when two laptop computers containing approximately 1.2 million AvMed members' names, addresses, telephone numbers, Social Security numbers, medical diagnosis information, and other private health information, were stolen from Defendant's corporate office. (*Id.* ¶ 2.)  Later investigations revealed that Defendant failed to encrypt the information contained on the stolen computers.  (*Id.* ¶ 35.)

On November 16, 2010, Plaintiffs Jean Resnick, Miguel Vasquez, Christopher Atkinson, Kirsten Atkinson and Rochel Albertson filed a putative class action in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Civil Division, captioned *Resnick, et. al v. AvMed, Inc, d/b/a AvMed*, Case No. 10-60022-CA-08.  In their complaint, Plaintiffs alleged claims for damages and injunctive relief against Defendant for failing to properly safeguard their personal health information in accordance with the Health Insurance Portability and Accountability Act, 45 C.F.R. § 164.302, *et seq.* ("HIPAA").

On January 14, 2011—following Defendant's removal of the action to this Court— Plaintiffs filed their First Amended Complaint. (Dkt. 15.)  In their amended pleadings, Plaintiffs provided additional detail with respect to Defendant's insufficient security efforts and the resultant mass exposure of their Sensitive Personal Information, as well as specific allegations concerning Plaintiff Curry, who suffered actual identity theft and had accounts opened in her name, purchases made with her credit card, and her addresses changed with the Postal Service.

3

(*Id.* ¶ 46-54.)  Plaintiffs also added a count for unjust enrichment, alleging that they paid monthly premiums to Defendant, that Defendant was supposed to allocate a portion of those premiums to its promised data security efforts, that Defendant did not implement those efforts but retained the entirety of Plaintiffs' premiums in any event, and as a result, Plaintiffs overpaid for promised but unimplemented data security services and were entitled to partial refunds.  (*Id.* ¶¶ 109-114.)

Soon after, Defendant filed a motion to dismiss, which the Court granted after finding that Plaintiffs' allegations of harm were too speculative.  (Dkt. 30.)  On April 25, 2011, Plaintiffs filed their Second Amended Complaint (the "Complaint"), which dropped all Plaintiffs but Curry, added Plaintiff Moore as a party-plaintiff, and provided additional factual allegations linking their instances of identity theft to the December 2009 data breach.  (Compl. ¶¶ 67-74.) Notwithstanding, on July 12, 2011, the Court found that the pleadings still failed to allege a cognizable injury, and dismissed the Complaint with prejudice.  (Dkt. 39.)

Plaintiffs appealed the dismissal to the Eleventh Circuit and, after full briefing and oral argument, the Eleventh Circuit reversed in part and affirmed in part.  Acknowledging that the appeal presented an issue of first impression in this Circuit, the court first found that Plaintiffs' allegations were sufficient to establish Article III standing.  *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1327-28 (11th Cir. 2012).  The Eleventh Circuit also found that Plaintiffs had established a plausible causal connection between the December 2009 data breach and their instances of identity theft and, thus, that the alleged injuries were not prohibitively speculative.  *Id.*  As for Plaintiffs' unjust enrichment theory, the Eleventh Circuit recognized that the allegations regarding Defendant's alleged failure to allocate a portion of the insurance premiums paid toward the administrative costs of data security were sufficient to state a claim for unjust enrichment.  *Id.* at 1328.

4

The Eleventh Circuit remanded the case on October 9, 2012, and shortly thereafter, on October 26, 2012, AvMed answered the Second Amended Complaint and also filed a Motion to Strike Class Allegations.  (Dkts. 51, 52.)  Plaintiffs responded but before AvMed filed its reply, the Court denied Defendant's motion as premature.  (Dkts. 57, 58.)  A few weeks later, the Parties conducted their Rule 26(f) conference, and shortly after that, Plaintiffs propounded their First Sets of Interrogatories and Requests for the Production of Documents, and the Parties began to exchange documents and information.

### B.    The Parties' Settlement Efforts and Negotiations.

Beginning in December 2012, the Parties engaged in discussions to explore the potential for settlement, and ultimately decided to give mediation a chance.  (*See* Declaration of Ari J. Scharg ¶ 4, ("Scharg Decl.") attached as Exhibit 2.)  They selected Rodney A. Max of the Upchurch Watson White & Max Mediation Group to serve as mediator (*id.*), and jointly moved to stay the case.  (Dkts. 72-73.)

On January 18, 2013, the Parties met for a formal, in-person mediation with Mr. Max in Miami, Florida.  (Scharg Decl. ¶ 5.)  Over the course of a full day of negotiations, the Parties engaged in productive discussions and, though unable to agree to the principal terms of a settlement at that time, agreed to continue speaking.  (*Id.*)  Over the next six months, the Parties, with the assistance of Mr. Max, engaged in several additional rounds of arm's-length negotiations.  (*Id.* ¶ 6.)  Eventually, the Parties made enough progress that Mr. Max suggested that they sit down for a second in-person mediation to work through certain remaining issues. (*Id.*)  As such, the Parties met again with Mr. Max in Miami, Florida on April 11, 2013.  (*Id.* ¶ 7.)  This time, the Parties made substantial progress towards settlement and agreed to work through the remaining issues that stood in the way of a complete resolution.  (*Id.*)

Finally, on May 19, 2013, after several additional rounds of arm's-length negotiations presided over by Mr. Max, the Parties reached an agreement on the principal terms of a class settlement, which they memorialized in a Memorandum of Understanding.  (*Id.* ¶ 8.)  However, Class Counsel insisted that any negotiations about attorneys' fees occur only after relief to the Classes was agreed upon.  (*Id.* ¶ 9.)  Over the next four months, the Parties exchanged several drafts of the agreement and related documents until they were finalized.  (*Id.* ¶ 10.)  On October 21, 2013 the Settlement was executed and Plaintiffs moved for Preliminary Approval.  (Dkt. 77.)

On October 25, 2013, the Court granted preliminary approval, certifying the two proposed Settlement Classes, approving the Parties' proposed Notice Plan, and setting January 30, 2014 as the deadline for class members to object or opt out of the Settlement.  Prior to the exclusion and objection deadline, on January 23, 2013, Plaintiffs filed a Motion for Reasonable Attorneys' Fees, Expenses, and Incentive Award, which is currently pending before this Court. (Dkt. 85.)  A copy of that motion was placed on the settlement website the same day.  (*See* Declaration of Jennifer M. Keough ["Keough Decl."], attached hereto as Exhibit 3, ¶ 12.)[3]  The Parties have received only one objection to the Settlement and only 62 individuals have sought to be excluded.  (Scharg Decl. ¶ 18; Keough Decl. ¶ 16.)

## III.  THE TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the Court are set forth in their entirety in the Settlement Agreement (*see* Ex. 1), and are also briefly summarized below:

**A.  Class Definitions.**  The Settlement Classes are defined as follows:

**The Premium Overpayment Settlement Class:**  All current and former AvMed customers who, prior to December 2009, paid AvMed for insurance, and whose Sensitive Personal Information was contained on the laptops stolen during the

---

[3]  Ms. Keough is the Chief Operating Officer for settlement administrator The Garden City Group, Inc. ("GCG") (Keough Decl ¶ 1.)

December 2009 Incident.

**The Identity Theft Settlement Class:**  All current and former AvMed customers whose Sensitive Personal Information was contained on the laptops stolen during the December 2009 Incident, and who suffered Identity Theft and incurred unreimbursed losses as a result.

Excluded from the Settlement Classes are: (a) Defendant; (b) any current or former employee, officer, or agent of Defendant; (c) the Settlement Administrator, and its respective parents, subsidiaries, successors, predecessors, and related entities; and (d) any trial judge(s) presiding over this Action, and the immediate family members of any such trial judge(s).  (Agreement ¶¶ 1.18, 1.33; Dkt. 82.)

B.     **Monetary Relief.**  Defendant has agreed to establish a Settlement Fund in the amount of $3,000,000, to pay for (i) Approved Premium Overpayment Claims, (ii) Approved Identity Theft Claims, (iii) Settlement Administration Expenses, (iv) Class Counsel's attorneys' fees and expenses, and (v) Plaintiffs' Incentive Awards.[4]

1.     *Premium Overpayment Claims.*

Under the Settlement, Premium Overpayment Settlement Class members who submit valid claim forms are eligible to receive up to $10.00 for each year they paid Defendant for insurance prior to the December 2009 data breach, subject to a maximum recovery of $30.00. This relief effectively reimburses Class members for the portion of premiums that Plaintiffs contend Defendant should have spent (but did not spend) on adequate data protection.  To be eligible for a payment, members of the Premium Overpayment Settlement Class must submit a Claim Form (*see* Ex. 1-A), signed under penalty of perjury, which states that they purchased

---

[4]     As noted above, on January 23, 2014, Plaintiffs filed their Motion for Reasonable Attorneys' Fees, Expenses, and Incentive Award, which pursuant to the Settlement, Defendant's have agreed to not oppose.  (*See* Dkt. 85.)

insurance from Defendant prior to December 2009, identifies the number of years that they paid

for such insurance, and indicates that they had the expectation that Defendant would protect their

personal information.  (Agreement ¶¶ 1.33, 1.45, 2.1(a).)

> 2.     *Identity Theft Claims*.

The Settlement also provides payments to Identity Theft Settlement Class members for

the amount of *any* unreimbursed monetary losses that occurred as a result of the December 2009

data breach.  To be eligible for a reimbursement, members of the Identity Theft Settlement Class

must submit a Claim Form (*see* Ex. 1-B), signed under penalty of perjury, which identifies all

such losses and provides supporting documentation.  (Agreement ¶¶ 1.45, 1.18, 2.1(b).)

> 3.     *Payment of Notice and Administrative Fees*.

Defendant will pay for the cost of sending notice to the Settlement Classes and any other

notice as required by the Court, as well as all costs of administration of the Settlement.  All

notice and administrative costs are to be deducted from the $3,000,000 Settlement Fund.

(Agreement ¶ 1.40.)

> C.     **Prospective Relief.**  In addition to the monetary relief above, Defendant was

required to and has implemented the following measures: (1) mandatory security awareness and

training programs for all company employees, (2) mandatory training on appropriate laptop use

and security for all company employees whose employment responsibilities include accessing

information stored on company laptop computers, (3) upgrading of all company laptop

computers with additional security mechanisms, including GPS tracking technology, (4) new

password protocols and full disk encryption technology on all company desktops and laptops so

that electronic data stored on such devices would be encrypted at rest, (5) physical security

upgrades at company facilities and offices to further safeguard workstations from theft, and (6)

the review and revision of written policies and procedures to enhance information security.

     **D.**    **Release of Liability.**  In exchange for the relief described above, Defendant and its related and affiliated entities will receive a full release of all claims related to the allegedly insufficient maintenance and protection of the Settlement Classes' Sensitive Personal Information that caused the December 2009 data breach.  (Agreement ¶¶ 1.37-1.39, 3.1-3.2.)

**IV.**    **CLASS MEMBERS HAVE BEEN PROVIDED SUFFICIENT NOTICE OF THE ACTION AND THE SETTLEMENT AGREEMENT**

     Following certification of a class, Rule 23 requires the court to direct to class members "the best notice that is practicable under the circumstances" describing, among other things, the action, the class certified, and class members' right to exclude themselves.  Fed. R. Civ. P. 23(c)(2)(B).  Further, before granting final approval to a proposed class settlement, the court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  Finally, the Due Process Clause also guarantees unnamed class members the right to notice of a class settlement. *U.S. v. Alabama*, 271 F. App'x 896, 901 (11th Cir. 2008).

     In order to satisfy these requirements, notice of a class settlement must "apprise class members of the terms of the settlement agreement in a manner that allows class members to make their own determinations regarding whether the settlement serves their interests." *Alabama*, 271 F. App'x at 900-01; *see also In re CP Ships Ltd. Sec. Litig.*, 578 F. 3d 1306, 1317 (11th Cir. 2009) *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ("Notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'") (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

     Neither Rule 23 nor due process requires receipt of actual notice by all class members,

*Jurvis v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012), and the Federal Judicial Center

has suggested that a notice plan that reaches 70% of class members is reasonable.  Federal

Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language

Guide* at 3 (2010), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/

NotCheck.pdf.  Further, in determining the sufficiency of class notice, courts "look solely to the

language of the notices and the manner of their distribution."  *Alabama*, 271 F. App'x at 901.

However, the notice "need not include every material fact or be overly detailed." *Faught v. Am.

Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011) (internal quotations omitted).

　　　　Here, this Court approved the notice plan set forth in the Settlement Agreement, which

called for notice mailed directly to class members—via U.S. Mail and email—as well as

publication of the Notice on the settlement website ("Notice Plan").  (Dkt. 82). The content of

each form of notice was neutral in tone and written in plain, easily understandable language.

(Agreement Exs. C-E; Dkt. 82 ¶ 8.)  In approving the Notice Plan, this Court found that it "is the

best notice practicable under the circumstances," "complies fully with the requirements of the

Federal Rules of Civil Procedure," and "meets the requirements of Due Process."  (Dkt. 82 ¶ 8.)

This Court further found that the Notice Plan "is reasonably calculated to, under all

circumstances, reasonably apprise members of the Settlement Class of the pendency of this

action, the terms of the Settlement Agreement, and the right to object to the settlement and to

exclude themselves from the Settlement Classes."  (*Id.*)

　　　　GCG and the Parties diligently followed the Court-approved Notice Plan.  First, AvMed

provided to GCG electronic files containing the names, U.S. Mail addresses, and, if available, the

email addresses for all 1,217,912 potential class members whose personal information was

contained on the laptops stolen during the December 2009 data breach.  (Keough Decl. ¶ 4.)

GCG was able to successfully deliver the Court-approved notice via email on December 23, 2013 to 33,626 potential class members and then sent the remaining 1,125,990 potential class members with valid mailing addresses the notice via First Class U.S. Mail on December 23 and December 30, 2013.  (Keough Decl. ¶¶ 7-10.)  While some of the notices were returned as undeliverable, ultimately more than a sufficient percentage of the class members received direct notice of the Settlement by U.S. Mail and/or email.  (*Id*.)  Finally, in accordance with the Notice Plan and the Class Action Fairness Act, 28 U.S.C. § 1715, AvMed's counsel sent notice of the Settlement to the United States Attorney General and the Attorneys General for all 50 states, the District of Columbia, and Puerto Rico.  (Dkt. 83.)

Also pursuant to the Court-approved Notice Plan, GCG created a case-specific website, www.databreachsettlement.com, which went live on November 4, 2013.  (Keough Decl. ¶ 11.) The website contains various information about the Settlement, including the Court-approved settlement notice, answers to frequently asked questions, and contact information for the Settlement Administrator and Class Counsel.  (*Id*.)  Additionally, the settlement website provides members of the Classes with the ability to electronically file claim forms on-line or to download paper claim forms for paper submission.  (*Id*.)

In short, not only did the notice provided to the Classes comply with the Court-approved Notice Plan, Rule 23, and Due Process, it was also ultimately successful.

## V.   THE PROPOSED SETTLEMENT IS FUNDAMENTALLY FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

Under Rule 23, this Court may approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see also CP Ships*, 578 F.3d at 1317-18 ("The district court reviews a class action settlement to determine whether it is fair, reasonable and adequate.").  In addition, the Court makes an inquiry into "whether the

settlement was procured by collusion among the parties or was the result of arms-length and informed bargaining." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1315 (S.D. Fla. 2005); *see also In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 ("In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties.") (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).  A proposed class action settlement should be reviewed in light of the strong public and judicial policy favoring settlement of class actions, and, in doing so, the Court should not substitute its judgment for that of the parties.  *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011); *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits").

In determining whether a settlement is fair, reasonable, and adequate, the Eleventh Circuit instructs courts to consider the following factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*CP Ships*, 578 F.3d at 1318 (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)).  Ultimately, "[a] settlement is fair, reasonable and adequate when the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued."  *In re Checking*, 830 F. Supp. 2d at 1344.  Here, the Settlement Agreement easily passes both tests, having been the product of arm's-length, informed negotiations between the Parties with the assistance of a neutral mediator, and satisfying each of the Eleventh Circuit's *Bennet* factors.

**A.     The Settlement Was the Result of Arm's-Length Negotiation Between the Parties with the Assistance of an Experienced Mediator.**

The context in which the Settlement was reached confirms that it was the result of arm's-length and informed negotiations as opposed to collusion among the parties.

To start, the Settlement was reached only after three years of hard-fought litigation, which included the exchange of formal and informal discovery, an appeal to the Eleventh Circuit, two in-person mediation sessions, and multiple rounds of additional arm's-length negotiations over a period of ten months facilitated by a highly experienced and well-respected neutral, Rodney A. Max—described by another court in this district as "an eminently qualified mediator." *Fresco v. Auto. Directions, Inc.*, No. 03-cv-61063, 2009 WL 9054828, at *5 (S.D. Fla. Jan. 20, 2009). (Scharg Decl. ¶¶ 11-12); *see Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to the absence of collusion."); *see also In re Checking Account Overdraft Litig.*, 275 F.R.D. at 662 (finding an absence of collusion where settlement was reached with capable and experienced counsel with the assistance of a well-qualified and experienced mediator). Moreover, the Parties agreed on the terms of the Settlement through experienced counsel, who had at their disposal both prior to the mediation sessions and during subsequent negotiations ample information to evaluate the terms of any proposed agreement so as to reach a fair and reasonable compromise. (Scharg Decl. ¶ 13.)

As such, it is clear that the Settlement was the result of arm's-length and informed negotiation between the Parties, and given that, this Court should not hesitate to approve it.

**B.     The Settlement Satisfies Each of the *Bennett* Factors.**

In addition to being the result of arm's-length negotiations free from fraud or collusion, the Settlement here also satisfies each of the *Bennett* factors. While the Eleventh Circuit

instructs district courts to consider the *Bennett* factors, "[i]n evaluating these considerations, the district court should not try the case on the merits." *Perez*, 501 F. Supp. 2d at 1380. "Rather, the court must rely upon the judgment of experienced counsel and, absent fraud, should be hesitant to substitute its own judgment for that of counsel." *Id*. Here, as explained below, each of the *Bennett* factors weighs in favor of approving the Settlement Agreement.

### 1. *Likelihood of Success at Trial*

The first *Bennett* factor to consider in determining whether a settlement is fair, reasonable, and adequate is the likelihood of success at trial. "The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319; s*ee also Figueroa*, 517 F. Supp. 2d at 1323-24. Where success at trial is not certain for plaintiffs, this factor weighs in favor of approving the settlement. *See Fresco*, 2009 WL 9054828, at *4; *Perez*, 501 F. Supp. 2d at 1380. Here, although the Eleventh Circuit determined that Plaintiffs have standing to pursue their claims, and allowed their unjust enrichment claim to proceed beyond the pleadings stage, ultimate success at trial is far from guaranteed.

In order to prevail at trial, Plaintiffs would have to establish, among other things, that their identity thefts were caused by AvMed's December 2009 data breach, which may be difficult given that the wrongdoers were never apprehended. As Judge Pryor observed in his dissenting opinion, "although it is conceivable that the unknown identity thieves used the sensitive information stolen from AvMed to open the fraudulent accounts, it is equally conceivable, in the light of the facts alleged in the complaint, that the unknown identity thieves obtained the information from third parties." *Resnick*, 693 F.3d at 1331 (Pryor, J. dissenting). Thus, though Plaintiffs are confident that they would ultimately be able to demonstrate causation

through circumstantial evidence and their experts, they are also mindful of their evidentiary burden on this issue.

Further, and notwithstanding their belief in the strength of their case, Plaintiffs recognize that the expense, duration, and complexity of protracted litigation would be substantial and require further briefing on numerous substantive issues, evidentiary hearings, and further discovery, including expert discovery to establish that Defendant failed to protect its customers' sensitive information using industry standard and HIPAA-required safeguards, and that the December 2009 data breach caused the identity thefts (as discussed above).  (Scharg Decl. ¶ 14.) And assuming Plaintiffs can prove the above, they would also have to establish the measure of their damages.  (*Id.*)  Against the inherent uncertainty raised by each of the above-mentioned issues is the concrete nature of the relief afforded under the Settlement, where Premium Overpayment Settlement Class members will recover the portion of the premiums paid to Defendant that should have been (but allegedly were not) allocated to data security, and the Identity Theft Settlement Class will recover any unreimbursed damages caused by the December 2009 data breach.

As such, because ultimate success at trial is far from certain, and the value of the Settlement is unquestionably strong in comparison, the first *Bennett* factor weighs in favor of approving the Settlement.

### 2. *Range of Possible Recovery and Point at which Settlement is Fair, Reasonable, and Adequate*

Analysis of the second and third *Bennett* factors—the range of possibly recovery and the point on or below the range at which a settlement is fair, adequate and reasonable—is often combined.  *In re Sunbeam*, 176 F. Supp. 2d at 1331.  As in most litigation, "[t]he range of potential recovery spans from a finding of non-liability through varying levels of injunctive

relief, in addition to any monetary benefits to class members." *Figueroa*, 517 F. Supp. 2d at 1326 (citing *Lipuma*, 406 F. Supp. 2d at 1322) (internal quotation omitted). However, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Figueroa*, 517 F. Supp. 2d at 1326.

Far from a settlement that provides only fractional recovery, the Settlement achieved in this case creates a $3,000,000 Settlement Fund that will be used to provide near-complete[5] relief to the Settlement Classes. First, Premium Overpayment Settlement Class members are entitled to recover $10 per year (up to $30), which represents reimbursements for data security that they paid for but allegedly did not receive. (*See* Agreement § 2.1(a).) The true measure of this recovery comes from comparing the *actual*, per-member cost of providing the missing security measures—e.g., what AvMed would have paid to encrypt and password protect laptop computers containing its customers' sensitive information, and otherwise comply with HIPAA's security regulations—against what Class members stand to receive through the Settlement. According to Plaintiffs' retained expert C. Matthew Curtin, *C.I.S.S.P.* (Certified Information Security Systems Professional), AvMed should have spent $1,000,000 to $3,400,000 to implement the data security protections encompassed in the premiums it was charging. (*See* Dkt. 81.) As such, the collective range of recovery for the 460,000 members of the Premium Overpayment Settlement Class is $0 to $3,400,000, and thus, the per-person recovery provided by the Settlement (i.e., $10 per year, up to $30) falls within the upper bounds of what any individual member of the

---

[5]     If the number of valid claims by the Settlement Classes exceeds the amount of the Settlement Fund after paying the costs of notice, settlement administration, attorneys' fees, and incentive awards, then payments to the Classes will be reduced *pro rata*. Although members of the Settlement Classes have until March 31, 2014 to file claims, Class Counsel believe there will be sufficient funds available to pay the full amount to each Premium Overpayment and Identity Theft Settlement Class member that submits a valid claim. (Scharg Decl. ¶ 19.)

Premium Overpayment Settlement Class might recover through an actual trial on an unjust enrichment theory.  Second, Identity Theft Settlement Class members may submit claims for the *entire* amount of their unreimbursed losses.  (Agreement § 2.1(b).)

Moreover, both Settlement Classes will receive the benefits of the prospective relief under the Settlement, which ensures their sensitive personal information is secure going forward. *See Fresco*, 2009 WL 9054828 at *4 ("In order to be fair, adequate, and reasonable . . . a settlement should at the least ensure compliance with the [the federal statute at issue].  The proposed settlement offers injunctive relief that not only ensures compliance with the [statute], but also provides for specific business practice changes and enhancements designed to protect the privacy of the class members.")

Finally, the Court need not rule on a blank slate when it comes to the Settlement's fairness, reasonableness, and adequacy.  The relief available to the Settlement Classes here easily surpasses the benefits conferred by other "data breach" settlements that have received final approval from federal district courts throughout the country, which typically offer free credit monitoring and identity theft reimbursement.  *See, e.g., Beringer v. Certegy Check Services, Inc.,* No. 07-cv-01657 (Dkt. 59) (M.D. Fla. Sept. 3, 2008) (establishing a $5 million fund to provide approximately 37 million class members with up to two years of credit monitoring and identity theft reimbursement); *In re Heartland Payment Sys. Inc. Customer Data Sec. Breach Litig.*, No. 09-MDL-2046, 851 F. Supp. 2d 1040 (S.D. Tex. 2012) (establishing a $2.4 million fund from which to provide over 100 million class members with identity theft reimbursement).

As such, the Settlement approaches the best that Plaintiffs could have hoped to achieve at trial and is in the upper range of what is fair, adequate and reasonable.  Thus, the second and third *Bennett* factors weigh in favor of approval.

### 3.   *Complexity, Expense, and Duration of Litigation*

The next *Bennett* factor to consider is the complexity, expense, and duration of litigation. As the Eleventh Circuit has noted, "settlements contribute greatly to the efficient utilization of our scarce judicial resources." *Cotton*, 559 F.2d at 1331. "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigation." *Perez*, 501 F. Supp. 2d at 1381. In evaluating this *Bennett* factor, courts "should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma*, 406 F. Supp. 2d at 1323. Here, this factor weighs in favor of approving the Settlement Agreement.

In the absence of the Settlement, it is certain that the expense, duration, and complexity of protracted litigation—which has already reached the Eleventh Circuit—would be substantial. Indeed, continued litigation would require further discovery (including expert discovery on many key liability and damages issues) and briefing on numerous substantive motions. (Scharg Decl. ¶ 14.) As noted above, summary judgment and/or trial would likely require the retention of competing experts, which would come at no small cost to the Parties. (*Id.* ¶ 15.) And, if the Court were to grant summary judgment in one side's favor or class certification, given the amount at issue, the losing side would likely take the case back to the Eleventh Circuit. (*Id.*) In either case, continued litigation of this matter would delay its resolution and inflict unnecessary additional expense on both sides. Where unnecessary additional costs and delay are likely to be incurred absent a settlement, "it [is] proper to take the bird in the hand instead of a prospective flock in the bush." *Lipuma*, 406 F. Supp. 2d at 1323 (quoting *In re Shell Oil Refinery,* 155 F.R.D. 552, 560 (E.D.La.1993)). *See also Perez*, 501 F. Supp. 2d at 1381 ("With the

uncertainties inherent in pursuing trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a settlement are clear.").

The complexity, expense, and duration of litigation thus weighs in favor of approving the Parties' settlement.

### 4. *Substance and Amount of Opposition to Settlement*

The next *Bennett* factor to consider is the substance and amount of opposition to the settlement. Here, the Court-approved notice plan prompted only sixty-two requests for exclusion and a single hand-written *pro se* objection. (The Collins Objection is attached to the Scharg Decl. as Exhibit 2-A.) Although styled an "objection," the submission simply conveys its author's view that those who have suffered identity theft as a result of the December 2009 data breach (i.e., the Identify Theft Settlement Class members) "should [be] recompensed for their costs and time if it truly came from this data breach." (*Id.*) But that is exactly what the Settlement provides for. As such, it appears that the lone objection actually agrees with the relief afforded to the Identify Theft Settlement Class. If anything, the lone *pro se* objection appears to express a general disapproval of the lawsuit and class action litigation in general.[6] These types of "philosophical" objections are inevitable in large class actions and thus are not considered to "impugn the adequacy of the settlement itself." *See Domonoske v. Bank of Am., N.A.,* 790 F.

---

[6]    In fact, Jim and Virginia Collins, the sole objectors to this case, habitually file *pro se* objections to class action settlements. Although they have a right to file objections under Rule 23, their objections typically focus on nothing more than their personal "philosophical" views about class actions, rather than why they believe the settlements are not fair, reasonable, and adequate. *See, e.g., In re Wachovia Equity Sec. Litig.*, No. 08-cv-6172, 2012 WL 2774969, at *4 (S.D.N.Y. June 12, 2012) ("The objections submitted by Jim and Virginia Collins . . . object generally to the lawsuit, claiming that it was frivolous. Their concerns seem to be aimed at the lawsuit itself, and whether Wachovia should have settled, rather than the fairness of the settlement to the class, and thus are properly taken up in another forum. They certainly do not undermine the Court's conclusion that the settlement is fair to the class.").

Supp. 2d 466, 474 (W.D. Va. 2011) (in class of three-million, "most of the 59 objections show a philosophical disagreement with class action litigation, a general disagreement with this litigation in particular, or dissatisfaction with class counsel's requested attorney's fees").

In any event, the fact there is only one objection despite the comprehensive notice provided to the class demonstrates that class members find the agreement reasonable and fair, and strongly favors approval of the settlement. *See Lipuma*, 406 F. Supp. 2d at 1324 ("a low percentage of objections points to the reasonableness of a proposed settlement and supports its approval."); *Allapattah Servs., Inc. v. Exxon Corp.*, No. 91-cv-0986, 2006 WL 1132371, at *13 (S.D. Fla. Apr. 7, 2006) ("I infer from [the] absence of a significant number of objections that the majority of the Class found [the settlement agreement] reasonable and fair."). Moreover, while notice of the Settlement was sent to the U.S. Attorney General, and Attorneys General of all 50 states, the District of Columbia, and Puerto Rico, none have voiced any opposition to the terms of the Agreement. (Scharg. Decl. ¶ 16.) This lack of governmental opposition to the Settlement likewise militates in favor of its approval. *See Fresco*, 2009 WL 9054828 at *5 (noting, in addressing this *Bennett* factor and approving settlement, that "no state or federal government officials have filed objections").

In all, the reaction of the members of the Classes and legal commentators has been overwhelming supportive of the Settlement. Class Counsel's office has fielded calls from over 750 class members with inquires about the Settlement, most of which commented favorably about its terms. (Scharg Decl. ¶ 17.) One class member even expressed that, "[o]n behalf of the people, I want to thank you for your efforts and energy in representing and protecting us in this important matter." (*Id.*)

Accordingly, the substance and amount of opposition to the Settlement is miniscule in

comparison to the support behind it, and thus weighs in favor of final approval.

### 5.     *Stage of Proceedings at which Settlement Achieved*

The final *Bennett* factor looks to the stage of proceedings at which the settlement was

achieved.  Courts look at this factor "to ensure that the plaintiffs have access to sufficient

information to adequately evaluate the merits of the case and weigh the benefits of the settlement

against further litigation."  *Perez*, 501 F. Supp. 2d at 1383; *see also Access Now, Inc. v. Claire's

Stores, Inc.*, 00-cv-14017, 2002 WL 1162422, at *7 (S.D. Fla. May 7, 2002) ("Because the

parties have expended much effort in analyzing the issues, this Court should find that the parties

are at a proper juncture with sufficient information to settle this action."); *In re Sunbeam*, 176 F.

Supp. 2d at 1332 ("Obviously, the case had progressed to a point where each side was well

aware of the other side's position and the merits thereof.  This factor weighs in favor of the Court

finding the proposed settlement to be fair, adequate, and reasonable.").

Here, the Settlement Agreement was three years in the making and not reached until the

Parties had engaged in significant motion practice and the commencement of class- and merits-

focused discovery, including the formal and informal production of information and documents.

Plaintiffs ensured that they were provided with sufficient information about the data breach at

issue, the resulting governmental investigation, the remedial efforts taken by Defendant

following the breach, the sizes of the Settlement Classes, and the range of each Class's potential

damages—all *before* completing the mediation process and agreeing to this Settlement.  (Scharg

Decl. ¶ 13.)

Hence, there should be no question that, by the time the Settlement was reached,

Plaintiffs had enough information to sufficiently evaluate the strength of the claims of the

Settlement Classes and weigh the benefits of Settlement against continued litigation.  The stage

of proceedings factor thus weighs in favor of approval as well.

## VI.    CONCLUSION

As demonstrated above, the Settlement Agreement here—which provides significant and immediate results for the Classes—was the result of arm's-length, informed negotiation and satisfies each of the six *Bennett* factors.  As a result, the Settlement is fair, reasonable, and adequate under Rule 23, and Plaintiffs respectfully request that this Court enter an order granting final approval to the Settlement Agreement.[7]

                Respectfully submitted,

Dated: February 14, 2014         JUANA CURRY and WILLIAM MOORE,
                individually and on behalf of a class of similarly
                situated individuals

                By:  /s/ Ari J. Scharg
                Jay Edelson (Admitted *Pro Hac Vice*)
                jedelson@edeslon.com
                Ari J. Scharg (Admitted *Pro Hac Vice*)
                ascharg@edelson.com
                Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
                bthomassen@edelson.com
                EDELSON PC
                350 North LaSalle Street, Suite 1300
                Chicago, Illinois 60654
                Tel: 312.589.6370

                By:  /s/ Edmund A. Normand

                Edmund A. Normand (Florida Bar No. 865590)
                ednormand@whkpa.com
                EDMUND A. NORMAND PLLC
                4381 New Broad Street
                Orlando, Florida 32814
                Tel.: 407.625.9043

                *Attorneys for Plaintiffs and the Classes*

---

[7]    A [Proposed] Final Judgment is attached hereto and has also been submitted to the Court separately via email to Chambers.

## <u>CERTIFICATE OF SERVICE</u>

I, Edmund A. Normand, an attorney, hereby certify that on February 14, 2014, I served the above and forgoing ***Plaintiffs' Motion And Memorandum In Support Of Motion For Final Approval Of Class Action Settlement***, on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF system.

/s/ Edmund A. Normand